UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SUNCOAST WATERKEEPER,

             Plaintiff,

    vs.

ATLANTIC TNG, LLC,

             Defendant.

Civil Case No.:    8:21-cv-02168

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

SUNCOAST WATERKEEPER ("SCWK" or "Plaintiff"), by and through its counsel, hereby alleges:

**I.    JURISDICTION AND VENUE**

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.    On June 24, 2021, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant ("notice letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region 4; the Secretary of the Florida Department of Environmental Protection ("DEP");

the Director of the Southwest District of the DEP; and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated by reference.

3.    More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of Florida has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.    Venue is proper in the Middle District of Florida pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   **INTRODUCTION**

5.    Defendant, a concrete manufacturer, discharges polluted stormwater from its manufacturing facility located in Sarasota.  These discharges are in violation of the Clean Water Act and the State of Florida's Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity.

6.    Florida's Multi-Sector Generic Permit is a National Pollution Discharge Elimination System ("NPDES") permit required under the Act that is issued by the DEP under the authority of Florida Statute Section 403.0885, which authorizes Florida to implement the NPDES program pursuant to authority delegated to the State of Florida by the EPA.  Pursuant to Florida Administrative Code ("F.A.C.") Rule 62-621.300(5)(a), Florida adopted the EPA's original Multi-Sector General Permit issued on September 29, 1995 (60 Fed. Reg. 50804) and subsequent corrections and modifications as amended on February 9, 1996 (61 Fed. Reg. 5248), February 20, 1996 (61 Fed. Reg. 6412), August 7, 1998 (63 Fed. Reg. 42534), September 30, 1998 (63 Fed. Reg. 52430), and January 19, 1999 (64 Fed. Reg. 2898) (hereinafter collectively referred to as the "MSGP").  Defendant's violations of the substantive and procedural requirements of the MSGP and the Act are ongoing and continuous.

7.      With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways.  In most of the Sarasota Bay area, storm water flows untreated either directly, or through municipal storm drain systems into Sarasota Bay and other receiving waters. Stormwater pollution accounts for the majority of the pollution entering the Sarasota Bay environment each year.  The effects of nonpoint source pollutants on specific waters vary and may not always be fully assessed.  Stormwater pollution poses a health risk to humans, harms marine life, closes beaches, contaminates the ocean, and harms the environment. These contaminated storm water discharges can and must be controlled for the Sarasota Bay ecosystem to regain its health.

8.      High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis.  TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey).  Deposited solids alter fish habitat, aquatic plants, and benthic organisms.  TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS.  Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

9.      Sarasota Bay area waters are ecologically sensitive estuarine systems with special aesthetic, economic and recreational significance for people living in the surrounding communities.  Included amongst these resources are specially recognized and designated Outstanding Florida Waters, pursuant to 62-302.400 F.A.C., as worthy of special water quality protections because of their natural attributes.  Portions of Whitaker Bayou, which receive toxic metals and other contaminants in storm water discharges from Defendant's industrial activities are listed on the State of Florida's Clean Water Act Section 303(d) list of impaired water bodies.

A water body that is listed as impaired cannot support its designated beneficial uses. The beneficial uses of the waters that receive pollutants from Defendant's industrial stormwater discharges include aquatic life (estuarine and freshwater habitat, fish migration, fish spawning, preservation of rare and endangered aquatic species, shellfish propagation,) primary contact and recreation, navigation, and fish consumption.

10.     Sarasota Bay area waters provide essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that Sarasota Bay area waters have for people in the surrounding communities. The public's use of Sarasota Bay area waters for recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation exposes many people to toxic metals and other contaminants in storm water discharges and impairs those activities.

## III.   PARTIES

11.     Plaintiff Suncoast Waterkeeper is a non-profit public benefit corporation with members throughout Southwest Florida, including Pinellas, Hillsborough, Sarasota, Manatee, and Charlotte Counties. SCWK is dedicated to protecting and restoring the Florida Suncoast's waterways on behalf of its members through enforcement, fieldwork, advocacy, and environmental education for the benefit of the communities and SCWK's members that rely upon these precious coastal resources. To further its mission, SCWK actively seeks federal and state implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members. SCWK has been registered as a non-profit corporation in Florida since 2012 and has maintained its good and current standing in Florida since that time. SCWK is a licensed member of Waterkeeper Alliance, Inc., an international non-profit environmental organization, made up of over 350 separate Waterkeeper programs, such as SCWK. SCWK's office is located in Sarasota, Florida.

12.     Members of SCWK use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged. Members of SCWK use those

waters for fishing, boating, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of SCWK's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Act and the MSGP.  The relief sought herein will redress the harms to SCWK caused by Defendant's activities.

13.     Plaintiff brings this action on behalf of its members, respectively.  Plaintiff's interest in reducing Defendant's discharges of pollutants into Sarasota Bay and its tributaries and requiring Defendant to comply with the requirements of the MSGP are germane to SCWK's purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of any of SCWK.

14.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of each of its members, for which harm it has no plain, speedy or adequate remedy at law.

15.     Defendant ATLANTIC TNG LLC ("Atlantic TNG") is a limited liability corporation that owns and/or operates an industrial facility located at 1701 Myrtle Street, Sarasota, FL 34234 (the "Facility").

## IV.   STATUTORY BACKGROUND

### Clean Water Act

16.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

17.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  It authorizes the EPA to issue NPDES permits directly and also to delegate the authority to issue NPDES

permits to state agencies.

18.     States with EPA-approved NPDES permit programs are authorized to regulate industrial storm water discharges through individual permits issued to dischargers or through general permits that cover a category of dischargers. 33 U.S.C. § 1342(p).

19.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized the DEP to issue NPDES permits including general NPDES permits in Florida.

20.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $56,460 per day per violation for violations occurring after November 2, 2015 pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

**Florida's MSGP**

21.     The DEP elected to issue the MSGP as the statewide general permit for industrial storm water discharges.  Thus, Florida has a single, statewide general permit applicable to all industrial storm water dischargers.

22.     In order to discharge storm water lawfully in Florida, industrial dischargers must obtain coverage under and comply with the terms of the MSGP or obtain and comply with an individual NPDES permit.  33 U.S.C. § 1311(a).

23.      The MSGP contains a variety of substantive and procedural requirements that all dischargers must meet.

24.     Part XI.E of the MSGP pertains to Sector E facilities.  These are facilities that possess, *inter alia*, a Standard Industrial Classification ("SIC") Code of 3272.  Sector E facilities discharge storm water associated with industrial activity associated from manufacturing concrete, gypsum, and plaster products.  In addition to the general requirements that the MSGP

imposes on all dischargers, Part XI.E of the MSGP imposes certain additional specific terms and conditions on Sector E Facilities.

25.     The MSGP is built on the expectation that its requirements will predominantly be met through a permittee's use of best management practices ("BMPs").  BMPs can take a wide variety of forms, from frequent sweeping to making structural modifications such as roofing or installing stormwater filtration and treatment, as necessary.

26.     The Clean Water Act requires that any NPDES permit issued by a state must apply and insure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).   In turn, the Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ."  33 U.S.C. § 1311(b)(2)(A).   The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants".  Id. § 1311(b)(2)(E).[1]

27.     Accordingly, the MSGP requires permittees to use BMPs that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the best available technology economically achievable ("BAT"), for toxic and non-conventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  *See* 60 Fed. Reg. at 50812; *see also* MSGP § XI.E.3.a.3, 60 Fed Reg. at 51146.

28.     The MSGP also requires dischargers to develop and implement a storm water pollution prevention plan ("SWPPP").  MSGP § IV.  Among other things, the SWPPP records

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

the BMPs applied at a particular industrial facility.  Sector E Facilities must develop and implement a SWPPP that comports with several requirements of Part XI.E of the MSGP. Through the SWPPP, requirements in Part XI.E of the MSGP implement its BAT/BCT requirements for Sector E facilities by requiring that the pollution prevention plan minimize pollution and requiring specific BMPs to effectuate such minimization.  *See* MSGP Fact Sheet § VI.B, 60 Fed. Reg. at 50812 ("The pollution prevention or BMP requirements in this permit operate as limitations on effluent discharges that reflect the application of BAT/BCT.")

29.     The MSGP provides that: "[T]he plan shall describe and ensure the implementation of practices that are to be used to reduce the pollutants in storm water discharges associated with industrial activity at the facility and to assure compliance with the terms and conditions of this permit.  Facilities must implement the provisions of the storm water pollution prevention plan required under this part as a condition of this permit."  MSGP § IV, 60 Fed. Reg. at 51115.

30.     Facilities subject to Sector E must include, *inter alia*, the following in their SWPPPs: (1) identification of all the members of a stormwater pollution prevention team responsible for developing and implementing the SWPPP; (2) a description of potential pollutant sources; (3) a site map including, *inter alia*, outfall locations, types of discharges in the drainage areas, location where significant materials are exposed to precipitation, monitoring locations, and flow directions; (4) an inventory of the types of materials at the site that may be exposed to precipitation; (5) a list of significant spills and leaks of toxic or hazardous pollutants that occurred at areas that are exposed to precipitation; (6) a summary of existing discharge sampling data; (7) a narrative description of potential pollutant sources from various activities; (8) a description and implementation of appropriate storm water management controls (including many specific requirements, detailed below); (9) spill prevention and response measures; (10) a quarterly inspection program; and an (11) an employee training program.  MSGP §§ XI.E.3.a(1), XI.E.3.a(2), XI.E.3.a(3).

31.     Part XI.E.3.a(3)(a) of the MSGP requires that Sector E facilities develop and

implement appropriate storm water management controls including the following:

- Measures "to minimize the discharge of spilled cement, aggregate, kiln dust, fly ash, and settled dust other significant materials in storm water from paved portions of the site that are exposed to storm water." Part XI.E.3.a(3)(a)(i).  This requires sweeping or equivalent measures on a weekly basis.

- The prevention of exposure of fine granular solids to storm water.  Part XI.E.3.a(3)(a)(ii).

- A preventive maintenance program including, *inter alia*, routine inspections and maintenance of storm water management devices.  Part XI.E.3.a(3)(b).

- Procedures to identify and clean up potential spills.  Part XI.E.3.a(3)(c).

- At least monthly inspections of equipment designated in the SWPPP with follow-up procedures to ensure that appropriate actions are taken in response to the inspections. Part XI.E.3.a(3)(d).

- Periodic training of all employees responsible for storm water management or implementing activities designated in the SWPPP.  Part XI.E.3.a(3)(e).

- Procedures related to the management of non-storm water discharges.  Part XI.E.3.a(3)(g).  This includes a certification that the storm water discharges have been tested or evaluated for the presence of non-storm water discharges.  For facilities producing concrete products, they must "insure that process waste water that results from washing of trucks, mixers, transport buckets, forms or other equipment are discharged in accordance with NPDES requirements or are recycled."  Part XI.E.3.a(3)(g)(i).

- "Structural, vegetative, and/or stabilization measures used to limit erosion."  Part XI.E.3.a(3)(h).

- Appropriate measures, such as swales, reuse of collected water, inlet controls, infiltration devices, and detention/retention devices.  Part XI.E.3.a(3)(i).

60 Fed. Reg. at 51145–46.

32.     In addition to requiring that permittees select and install BMPs and develop a SWPPP to meet the Clean Water Act's standards, the MSGP also requires facility operators to implement monitoring and reporting requirements that allow facility operators to determine whether they have adequately reduced the level of pollutants in storm water runoff through the development and proper implementation of the facility's SWPPP.  Permittees with concrete manufacturing facilities must monitor their storm water discharges at least quarterly during the second and fourth year of the permit term.  They must provide "the date and duration (in hours)

of the storm event(s) sampled; rainfall measurements or estimates (in inches) of the storm event that generated the sampled runoff; the duration between the storm event sampled and the end of the previous measurable (greater than 0.1 inch (") rainfall) storm event; and an estimate of the total volume (in gallons) of the discharge sampled." MSGP § XI.E.5.a., 60 Fed. Reg. at 51148. They must collect samples during sampling periods of January to March, April to June, July to September, and October to December. *Id*. at XI.E.5.a(1). Samples must be "collected from the discharge resulting from a storm event that is greater than 0.1" in magnitude and that occurs at least 72 hours from the previously measurable (greater than 0.1" rainfall) storm event." *Id*. at XI.E.5.a.(2).

33. In addition to analytic monitoring, dischargers must also take quarterly samples and make visual observations of representative discharges. MSGP § XI.E.5.c, 60 Fed. Reg. at 51149. Dischargers must document their observations of color, odor, clarity, floating solids, settled solids, suspended solids, foam, oil sheen, and other obvious indicators of storm water pollution at each discharge location. *Id.* These observations are to be recorded and kept onsite with the SWPPP. *Id.* Based on the results of the analytic and observational monitoring, dischargers are required to evaluate the need for additional BMPs and modifications to the facility's SWPPP. 60 Fed. Reg. at 50820–27, 50829–30.

34. Part XI.E.3(a)(4) of the MSGP requires Sector E dischargers to conduct comprehensive site compliance evaluations at least once per year. 60 Fed. Reg. at 51147. This requires a comprehensive review of a facility and its storm water pollution control measures. The outcome of this evaluation requires revisions to a facility's SWPPP. *Id*.

35. For Sector E facilities, the MSGP establishes the following cut-off concentrations ("benchmark values") for pollutants of concern: total suspended solids ("TSS") – 100 mg/L and total recoverable iron – 1.0 mg/L. MSGP, § XI.E.5.a. Sector E facilities must compare the average annual concentrations of these parameters in their storm water discharges to these cut-off concentrations and "place special emphasis on methods for reducing the presence of those parameters in storm water discharges" whenever there is an exceedance. 60 Fed. Reg. at 50875

(Monitoring and Reporting Requirements).  They "provide a reasonable target for controlling storm water contamination by pollution prevention plans." *Id*. at 51076.

36.     The cut-off concentrations are guidelines for determining whether a facility has implemented the requisite BAT/BCT level of control measures.  Further, exceedances of cut-off concentrations are reason for concern that pollution may have reached a level "at which a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish."  60 Fed. Reg. at 50824–25.

37.     The MSGP does not provide for any mixing zones by dischargers.  The MSGP does not provide for any receiving water dilution credits to be applied by dischargers.

**Beneficial Uses of Florida Surface Waters**

38.     The State of Florida has identified beneficial uses and designated all surface waters of the State of Florida as Class III – Recreation, Propagation and Maintenance of a Healthy, Well-Balanced Population of Fish and Wildlife, except for certain waters which are described in subsection 62-302.400(16), F.A.C.  Rule 62-302.400(15), F.A.C.  "Class I, II, and III surface waters share water quality criteria established to protect fish consumption, recreation and the propagation and maintenance of a healthy, well-balanced population of fish and wildlife."  Rule 62-302.400(4), F.A.C.

39.     In Sarasota County, the State of Florida provides the following exception to the Class III, designating the following waters as Class II – Shellfish Propagation or Harvesting: "Sarasota Bay – West of the Intracoastal Waterway Channel centerline."  See 62-302.400(17)(b)(58).

40.     The Sarasota Bay Estuarine System is also afforded special significance and protection as an "Outstanding Florida Water," pursuant to 62-302.400 F.A.C.

41.     The Sarasota Bay Estuarine System is additionally designated as a "Special Water" having been found to have exceptional recreational or ecological significance and that the environmental, social, and economic benefits of the designation outweigh the environmental, social, and economic costs (Rule 62- 302.700(5), F.A.C.).

11

## V.    STATEMENT OF FACTS

### Concrete Manufacturing Facilities

42.    Concrete manufacturing facilities have been identified as a major source of storm water contamination.  Industrial activities at such facilities include those associated with the combination of cement, aggregate, and water to form concrete.  Material storage and material handling at concrete product manufacturing plants may release a variety of harmful substances including but not limited to cement, aggregate, concrete, shale, clay, limestone, slate, slag, pumice, fly ash, and admixtures.  60 Fed. Reg. 50804, 50869 (listing common pollutants associated with Sector E—concrete product manufacturing facilities—as of 1995); see also id. at 51145–50 (outlining special requirements for Sector E); EPA, Industrial Stormwater Fact Sheet Series: Sector E, EPA-833-F-06-020, at 2–4 (Feb. 2021), https://www.epa.gov/sites/production/files/2015-10/documents/sector_e_glass.pdf (listing common pollutants associated with Sector E, as of 2021).  Activities associated with casting/forming concrete products may release substances including but not limited to reinforcing steel, latex sealants, and bitumastic coatings.  60 Fed. Reg. 50804, 50869.

43.    In addition to manufacturing of concrete products, such facilities also engage in vehicle and equipment washing.  Forklifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to areas on and off the premises.  Vehicles also expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.  The types of pollutants that are released into the immediate environment by concrete product manufacturing include, among those listed above: toxic metals such as iron, lead, zinc; as well as petroleum products including oil, gasoline, grease, and diesel fuel; battery fluids, acids and solvents; and suspended solids, pH-altering substances, chemical oxygen demand-altering substances, and biochemical oxygen demand-altering substances.

### Stormwater Pollution at the Atlantic TNG Facility

44.    Atlantic TNG has certified that the Facility is classified under SIC Code 3272, meaning that they are primarily engaged in manufacturing concrete products from a combination

of cement and aggregate.  The Facility is specifically engaged in the manufacturing of precast in-ground concrete structures used in either storm or sanitary applications to convey and manage water flows.  The majority of activity and storage at the Facility takes place outdoors, where pollutants are exposed to storm water.

45.   On information and belief, Plaintiff alleges that the Facility releases the following pollutants into the immediate environment: toxic metals such as iron, lead, zinc; as well as petroleum products including oil, gasoline, grease, and diesel fuel; battery fluids, acids and solvents; and suspended solids, pH-altering substances, chemical oxygen demand-altering substances, and biochemical oxygen demand-altering substances.

46.   The large number of trucks and other vehicles entering and leaving the Facility from the driveways track pollutants off-site onto public streets where rainfall washes these pollutants into storm drains that discharge into waters of the United States.

47.   On information and belief, Plaintiff alleges that storm water flows over the surface of the Facility where industrial activities and areas where airborne materials associated with the industrial processes at the Facility may settle onto the ground.  Plaintiff is informed and believes and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the Facility's storm water discharge locations.

48.   On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

**Permit Violations at the Facility**

49.   Defendant owns and/or operates the Facility, a concrete manufacturing facility located in Sarasota, FL.

50.   Based on Plaintiff's investigation, including a review of the Facility's Notice of Intent to Use Multi-Sector Generic Permit for Stormwater Discharge Associated With Industrial Activity ("NOI"), aerial photography, documents prepared by the DEP, and Plaintiff's

information and belief, storm water is collected and discharged from the Facility via at least four outfalls.

51.     Storm water discharged from the Facility flows into the Sarasota Municipal Separate Storm Sewer System ("MS4"), which empties into Whitaker Bayou and ultimately Sarasota Bay (collectively, "Receiving Waters").

52.     The Receiving Waters are waters of the United States.

53.     The Facility's current coverage under the MSGP is active from March 10, 2018, through March 9, 2023.  This is a continuation from the Facility's previous coverage under the MSGP, which ran from March 7, 2013, through March 6, 2018.

54.     MSGP permittees must limit pollution in industrial storm water to a level commensurate with the federal BAT and BCT standards; develop and implement SWPPPs that set forth the best management practices that the permittee is using to meet those federal standards; conduct routine inspections and monitoring, and report accurately the results of that monitoring.

55.     On information and belief, Plaintiff alleges that Atlantic TNG has failed to develop and/or implement sufficient BMPs at the Facility to limit pollution in industrial storm water to a level commensurate with the federal BAT and BCT standards:

- Atlantic TNG does not prevent storm water flows from coming into contact with the sources of contaminants.

- On information and belief, Plaintiff alleges that the Facility lacks sufficiently well-maintained structural controls and practices to minimize exposure of pollutants to storm water, to retain all storm water on site; or to prevent contaminants from entering into storm water.  On information and belief, Plaintiff alleges that Atlantic TNG does not sufficiently treat contaminated storm water prior to discharge from the Facility.

56.     On information and belief, Plaintiff alleges that since at least July 12, 2016, Atlantic TNG has failed to develop and/or implement an adequate SWPPP at the Facility in

accordance with the requirements of Part XI.E.3 of the MSGP.  The SWPPP for the Facility does not include, and Atlantic TNG has not implemented, the required minimum and industry specific BMPs necessary to reduce pollutant levels in discharges to BAT and BCT levels.  This is evidenced by sources of storm water contamination at the Facility, contaminant tracking around and off the Facility, and the Facility's discharges of storm water contaminated above pollutant levels without the requisite application of BAT/BCT.  The SWPPP for the Facility fails, *inter alia*, to adequately identify all storm water discharge locations and to describe all pollutant generating activities.  Atlantic TNG's failure to prepare and/or implement an adequate SWPPP in all the above respects constitute violations of the MSGP.  As a result, the discharges of storm water associated with industrial activity from the Facility are not in accordance with the effluent limitations contained in Atlantic TNG's NPDES permit, and therefore Atlantic TNG is violating Sections 301 and 402 of the Clean Water Act at the Facility.

57.    On information and belief, Plaintiff alleges that since at least July 12, 2016, Atlantic TNG has failed at the Facility to conduct Part XI.E.3.a.4 of the MSGP's required comprehensive site compliance evaluations at least once per year and to accordingly revise each Facility's SWPPP.

58.    On information and belief, Plaintiff alleges that since at least July 12, 2016, Atlantic TNG has failed to develop and/or implement an adequate monitoring and reporting program at the Facility in accordance with the requirements of Part XI.E.5 of the MSGP.  Plaintiff alleges that Atlantic TNG has typically taken storm water samples at the Facility on dates that were subsequent to large storm events.  This practice is a violation of the MSGP.  It artificially improves the quality of the sampling results – i.e. samples contain lower, unrepresentative levels of pollution – because they were collected after the prior storm event flushed pollutants away from the facility.  On information and belief, Plaintiff alleges that Atlantic TNG also frequently reported that no discharges occurred from the Facility despite evidence of numerous potential sampling events during a given reporting period.

59.    Since at least July 12, 2016, Defendant has taken samples or arranged for samples

to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's Discharge Monitoring Reports ("DMRs") submitted to the DEP.  Atlantic TNG certified the accuracy of each of those DMRs.

60.     In DMRs submitted to the DEP, the Facility has consistently reported high pollutant levels from its storm water sampling results.

61.     The levels of total suspended solids in storm water analyzed by the Facility have exceeded the cut-off concentration for total suspended solids of 100 mg/L established by the DEP in every storm water sample that the Facility has collected during the past five years.  For example, on January 24, 2019, the level of total suspended solids measured at one of the Facility's storm water outfalls was 758 mg/L, which is over 7.5 times the cut-off concentration. Defendant also has measured levels of total suspended solids in excess of 100 mg/L in storm water discharged from the Facility on February 24, 2016; May 4, 2016; July 19, 2016; December 6, 2016; April 19, 2019; and December 17, 2019.

62.     The levels of iron in storm water analyzed by the Facility have exceeded the cut-off concentration for iron of 1.0 mg/L established by the DEP in every storm water sample that the Facility has collected during the past five years.  For example, on January 24, 2019, the level of iron measured at one of the Facility's storm water outfalls was 6.43 mg/L, which is almost 6.5 times the cut-off concentration.  Defendant also has measured levels of iron in excess of 1.0 mg/L in storm water discharged from the Facility on February 24, 2016; May 4, 2016; July 19, 2016; December 6, 2016; April 19, 2019; and December 17, 2019.

63.     Subsequent to receiving Atlantic TNG's 2019 DMRs for the Facility, DEP sent Atlantic TNG a letter regarding exceedances of the cut-off concentrations for pollutants of concern at the Facility.  This letter requested "appropriate action(s)" to address the exceedances, including, *inter alia*, re-evaluating the effectiveness of the pollution prevention measures and controls identified in the Facility's SWPPP and documenting the results of this review in the SWPPP.  On information and belief, Plaintiff alleges that Atlantic TNG failed to take appropriate actions to address the exceedances and to then appropriately revise the SWPPP for the Facility.

64.     On June 21, 2018, DEP sent Atlantic TNG a letter subsequent to a May 23, 2018 NPDES inspection at the Facility.  This letter noted items of concern in an attached inspection report which indicated, *inter alia*, that the Facility failed to properly install and maintain BMPs, develop an adequate SWPPP, and conduct required inspections.  DEP required that Atlantic TNG respond within 15 days of receipt.  On information and belief, Plaintiff alleges that Atlantic TNG has failed to respond to the DEP's letter and failed to accordingly update its BMPs and SWPPP.

65.     On information and belief, Plaintiff alleges that Atlantic TNG failed to accurately report the duration between the storm event it sampled at the Facility and the end of the previous measurable (greater than 0.1" rainfall) storm event, as required by MSGP Part XI.E.5.a(2), for samples taken on the following dates: December 17, 2019; April 19, 2019; January 24, 2019; and December 6, 2016.

66.     On information and belief, Plaintiff alleges that Atlantic TNG failed to take and monitor any samples at the Facility from the required storm event during the third quarter of 2019 consistent with the requirements in MSGP Part XI.E.5.a(2).

67.     On information and belief, Plaintiff alleges that Atlantic TNG failed to take and monitor any samples at the Facility from three of its outfalls from the four required storm events during the 2016 and 2019 consistent with the requirements in MSGP Part XI.E.5.

68.     On information and belief, SCWK alleges that Atlantic TNG has routinely failed to make required visual observations of representative discharges from the three aforementioned unmonitored outfalls during the past five years consistent with the requirements in MSGP Part XI.E.5.c.

69.     On information and belief, Plaintiff alleges that since at least July 12, 2016, Defendant has failed to implement BAT and BCT at the Facility for its discharges of TSS, iron, and other pollutants.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

70.     As a result of Atlantic TNG's practices at the Facility, storm water containing

excessive pollutants is being discharged from the Facility during rain events into the Receiving Waters.

71.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the MSGP for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)

72.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

73.     The MSGP's SWPPP requirements oblige Sector E dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of total suspended solids, iron, and other un-monitored pollutants in violation of Part XI.E of the MSGP.

74.     Each day since July 12, 2016, that Defendant has failed to develop and implement BAT and BCT in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

75.     Defendant has been in violation of the BAT/BCT requirements every day since July 12, 2016.  Defendant continues to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

## SECOND CAUSE OF ACTION
### Failure to Prepare, Implement, Review, and Update
### Adequate Storm Water Pollution Prevention Plans
### (Violations of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)

76.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

77.     The MSGP requires Sector E dischargers to develop, implement, and revise an adequate SWPPP.

78.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement adequate SWPPP for the Facility is evidenced by, *inter alia*, by sources of storm water contamination at the Facility, contaminant tracking around and off the Facility, and the Facility's discharges of storm water contaminated above pollutant levels without the requisite application of BAT/BCT.

79.     Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

80.     Each day since July 12, 2016, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

81.     Defendant has been in violation of the SWPPP requirements every day since July 12, 2016.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

## THIRD CAUSE OF ACTION
### Failure to Conduct Adequate
### Comprehensive Site Compliance Evaluations
### (Violation of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)

82.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

83.     The MSGP requires Sector E dischargers to conduct comprehensive site compliance evaluations at least once per year, including a comprehensive review of a facility and

its storm water pollution control measures and subsequent revision of a facility's SWPPP.

84.     Defendant has failed to conduct adequate annual comprehensive site compliance evaluations for the Facility.

85.     Defendant's ongoing failure to conduct adequate annual comprehensive site compliance evaluations are evidenced by, *inter alia*, Defendant's failure to respond to requests from the DEP to take additional actions to address exceedances at the Facility and to updates the SWPPP for the Facility.

86.     Each day since at least July 12, 2016, that Defendant has failed to conduct adequate annual comprehensive site compliance evaluations for the Facility in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The failure to conduct adequate annual comprehensive site compliance evaluations are ongoing and continuous violations of the Act.

**FOURTH CAUSE OF ACTION**
**Failure to Develop and Implement**
**Adequate Monitoring and Reporting Programs**
**(Violation of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

87.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

88.     The MSGP requires Sector E facility operators to implement monitoring and reporting requirements that will allow facility operators to determine whether they have adequately reduced the level of pollutants in storm water runoff through the development and proper implementation of the facility's SWPPP.

89.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.

90.     Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, their practice of taking storm water samples on dates subsequent to large storm events, as well as their reporting that no discharges occurred

from the Facility despite evidence of numerous potential sampling events during a given reporting period.

91.     Each day since at least July 12, 2016, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the MSGP;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the MSGP;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendant to comply with the MSGP's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.   Order Defendant to prepare a SWPPP for the Facility consistent with the MSGP's requirements and implement procedures to regularly review and update the SWPPP;

g.   Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.   Order Defendant to pay civil penalties of up to $56,460 per day per violation for violations occurring after November 2, 2015 pursuant to Sections 309(d) and 505(a) of the Act, 33

U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

      i.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

      j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

      k.   Award any such other and further relief as this Court may deem appropriate.

Dated: September 10, 2021      Respectfully submitted,

      By:     */s/ Justin Bloom*

Justin Bloom
Trial Counsel
Florida Bar #89109
Justin Bloom Attorney at Law, PA
P.O. Box 1028
Sarasota, FL 34230
Telephone: (941) 275-2922
Facsimile: (866) 574-2169
Email: bloomesq1@gmail.com

*Attorney for Plaintiff* SUNCOAST WATERKEEPER